May it please the court, Martin Buchanan appearing for Linda Messick. That's correct, Judge Gould. This case is a little different from the last one because we don't have the proximate cause issue. Linda Messick took the Novartis drugs Aredia and Zometa for two years from 2002 to 2004, and then she had exposed necrotic bone in her mouth from 2005 through 2008, and she never went back on the drugs as Mr. Littrell did. The sole ground for the district court's ruling below was its Dalbert ruling on the exclusion of Dr. Jackson's testimony. The district court found that Dr. Jackson's testimony did not meet Dalbert under either the reliability or the relevance prongs. So I'd like to take some time. I know that Mr. Vecchione has already covered some of this, and I won't repeat what he said. I'd like to talk about the specific grounds for the district court's ruling and what the record in Messick actually shows. First, the district court found that Dr. Jackson had identified five risk factors other than bisphosphonates in his written report, and he had never explained the scientific basis for how he ruled out those five other risk factors. So there's a couple of things that are wrong with that analysis. Number one, Dr. Jackson did explain why he ruled out those five other risk factors. He explained in his deposition that based on his some 25 years of practicing as an oral surgeon in the Sacramento area, being the primary treater of ONJ patients in the Sacramento area, that this is just something that you don't see with delayed bone healing of eight weeks or longer for any of these other risk factors. Defense counsel asked Dr. Jackson... What does that mean? I understand that he kept saying, you know, we just don't see it. Yes. Does he mean, and it's a little confusing to me, because the delayed or exposed bone for a delayed period of time is part of the standard for the diagnosis. Under AMIS, yes. So what is it they don't see? They don't see exposed necrotic bone in the mouth persisting for eight weeks or longer. That is... Forgive me, but you have been immersed in this, and I have not, except for this appeal. So you're saying that I think it's undisputed. People can have ONJ without having taken this kind of family of drugs. Absolutely. But if they have that kind of ONJ, it doesn't persist? Correct. And that's the only thing that he's talking about when Jackson says you just don't see it? Yes. He says you do not see patients with delayed bone healing of eight weeks or greater from these other causes. This is a line of questioning where Dr. Jackson is presented with all of the other so-called risk factors for ONJ. So to diagnose ONJ, you don't have to have the delay? Correct. Yes. Thank you. And Dr. Jackson's testimony on this point, of course, is perfectly consistent with the AAOMS diagnostic criteria for BRONJ as opposed to ONJ. And the AAOMS position papers on this subject are, as Mr. Vecchione pointed out, for the purpose of providing guidance to clinicians on making a differential diagnosis of BRONJ as opposed to other delayed healing conditions. And one of the essential conditions for a diagnosis of BRONJ is this persistent area of necrotic bone lasting longer than eight weeks. And for Ms. Messick, it was three years. And then another element of the AAOMS criteria, of course, is ruling out the other major known cause of this kind of persistent lack of bone healing, and that is a history of radiation treatment to the jaw. The three AAOMS diagnostic criteria are history of treatment with bisphosphonates, delayed bone healing of eight weeks or longer, and then they rule out the third one is no history of radiation treatment to the jaw. Ms. Messick met all three of these conditions. It's totally undisputed. She never had radiation treatment to the jaw, and she had the other two conditions. And so what Dr. Jackson is saying is, based on his extensive experience treating ONJ patients, you would not see a patient appear with three years of lack of bone healing unless it was because of BRONJ or radiation treatment to the jaw, which didn't occur in this case. So he's offered a perfectly logical reason for ruling out all these other risk factors that are listed in his report. And he's- Logical reason for performing this differential diagnosis and being able to rule out every other risk factor. Does it boil down to him saying, I've never seen that? It boils down to, no, it's not just that. I mean, that's part of it is his own clinical experience. Okay. And I think that would be sufficient on its own. I mean, a doctor is entitled to draw reasonable conclusions from their own extensive experience in the field, and this court has said that in Primiano v. Cook. But it's also the AAOMS guidelines, because what he's saying is consistent with what's out there in the field and in the published literature. Well, the reason it's a little problematic for me is because I think the record tells me that even though he's the go-to guy in Sacramento for this type of condition, I think he'd seen 15 patients. I don't think that's correct. The testimony is that he has extensive experience treating ONJ patients before BRONJ emerged in 2003. I don't believe the record reflects exactly how many ONJ patients he testified, but it's over a substantial period of time from the 80s all the way through 2003 when BRONJ became a phenomenon, and he says he's the primary treater. He has extensive experience and never says exactly how many ONJ patients he's treated. Well, counsel, I think he did, but I'm talking about BRONJ patients as opposed to ONJ patients. So, right, that's the distinction. So perhaps what you're telling me is that he doesn't quantify the ONJ patients that he's treated, but you think that it's extensive experience and all those of that larger group that the subset of BRONJ patients was just 15. Is that right? I know they said that in their brief, Your Honor, and I checked the citations in the record that they cited to. I don't believe that the citations in their brief support that assertion. Okay. I don't want to take any more of your time. I'll check that myself. Thanks so much. Can I direct you to what the district court zeroed in on, as I understand it? I'm looking at page 8 of her ruling, ER 8, and she draws a distinction under California law between general causation and specific causation. And it seems to be that Judge Olson said he may qualify for general causation, but that's not good enough. That's why he's neither reliable nor relevant. I'm looking at line 15, and she says, as to specific causation, Dr. Jackson tried to rely on a pathology analysis to show that Ms. Messick's ONJ was caused by the drugs, but he admitted this was scientifically unreliable owing to the lack of preservation of the three-year-old bone sample. Then he performed a differential diagnosis, and he ruled that, I'm paraphrasing now, ruling out osteomyelitis, osteoacrosis, and, in general, to diagnose her with BRONJ. However, Jackson identified five other risk factors. He asserted that it just doesn't happen, which you've referred to, that a patient with all of Ms. Messick's risk factors but without exposure to the drugs would have developed ONJ, but he never explained the scientific basis for this conclusion. Indeed, when asked if there's any scientifically reliable way for him to determine in a patient who has multiple risk factors at one time which of those particular risk factors is causing the underlying necrotic bone in the jaw, he answered no. So the analysis of the district court appears to turn on a principle of California law, which, as she understands it, is that you have to show specific causation. Now, if that's a synonym for proximate cause, so be it, but to what extent does that affect the validity of her ruling as to his qualifications? Your Honor, we don't dispute that we have to prove both general causation, that the drug has the capability of causing these diseases, and specific causation that it did in this particular patient. Our dispute is not over that. Our dispute is over whether the court correctly found that Dr. Jackson could not testify as to specific causation. So let me go through each of these sentences that you just read and demonstrate why the court's analysis is incorrect. So let's start with the bone pathology sample. The bone pathology sample is not even mentioned in Dr. Jackson's report. He lists in his report all the things he looked at and relied on informing his opinions, says nothing about the bone pathology sample that was sent for a pathology report. Now, he's asked about it in his deposition, and he basically agrees that it's scientifically unreliable to rely on it, and we're not relying on it. He does say, well, it's an additional fact that might support my opinion, but it's clear he did not rely on it informing his opinions. In terms of ruling out other risk factors, I hope I've already explained, he did explain the scientific basis for why he ruled out the other risk factors, and that was based on, A, his own clinical experience treating ONJ patients, and, B, the AAOMS diagnostic criteria. And jumping back a little bit regarding the distinction between general causation and specific causation, on this same page of the court's ruling, the paragraph immediately preceding that, the last sentence says, these sources, referring to the publications that Dr. Jackson was relying on, these are only reliable for an assertion of general causation, not specific causation in Ms. Messick's case. That's not accurate. The AAOMS diagnostic, the publications, which is what she is referring to here, their explicit purpose is to provide guidance to clinicians in performing a differential diagnosis of a specific patient. That's specific causation, not general causation. The three diagnostic criteria are things the doctor is supposed to look at for that specific patient to diagnose that specific patient with BRONJ. So those publications were relevant and reliable for Dr. Jackson to rely on in determining specific causation. And I know I'm running out of time. The final sentence of this that you read, Judge Fischer, I think this is very important, too. And I'll read it because I think it's so important. When asked if there's any scientifically reliable way for him to determine, in a patient who has multiple risk factors at one time, which of those particular risk factors is causing the underlying necrotic bone in the jaw, he answered no. Well, I want, this is very important, and it's very important what was asked and what was not asked. And what was asked was, question, is there any scientifically reliable way for you to determine, in a patient who has multiple risk factors at one time, which of those particular risk factors is causing the underlying necrotic bone in the jaw, answer no. This was, by the way, in a different case, not in our case, but it doesn't matter. Two things about that question and answer. Number one, there's nothing in that question referring to the duration of the exposed necrotic bone in the jaw. It's just saying, if you know somebody has exposed bone and they have multiple risk factors, can you identify one as being the causal factor? And he says no. But when you add in persistent exposed bone for eight weeks or longer, then we know that his testimony is completely different. And we know that because that's what he testified to in his deposition. That's what the AAOMS guidelines state. Second point about that question and answer. Basically, what he's- Do you have a cite to his deposition? To that question and answer? Yeah. Yeah, excerpts of record 345 to 346. The second point is, what's really being asked and answered there is, if you've got multiple risk factors, can you isolate one as the sole cause? And he says no. But under California law, he doesn't have to isolate one cause as the sole cause of this condition. All he has to say is that the bisphosphonate exposure is a substantial factor in contributing to the disease or the severity of the disease. And there could be concurrent causes. And he repeated over and over again that many of these other risk factors are concurrent causes. For example, one of the risk factors that's listed in his report is the fact that Ms. Messick had a dental extraction at tooth number 28, and that was what initiated her bronze. And that's totally typical. It's very, very typical in these cases that a patient who is on these bisphosphonates then has some kind of dental extraction, and that's what initiates the disease. So it's a combination of the extraction or the dental work and the fact that they're on these bisphosphonates. If they're not on the bisphosphonates, then that doesn't happen. And that's why the AAOMS guidelines for treatment say, make sure you get all your dental work done before you go on these bisphosphonates. So it's a concurrent causal factor. Similarly, Dr. Jackson in his report refers to other risk factors. Two of the five are being Caucasian and being of advanced age. Well, Ms. Messick didn't develop bronze because she was a 73-year-old Caucasian. That made her more susceptible to bronze, but those are just contributing factors. And what the district court essentially did is it required Dr. Jackson to rule out all contributing factors. And that's just directly contrary to California law on concurrent cause. Counsel, I've got one question for you before you conclude. And this is overly simplistic, so I apologize. I probably won't know the answer to that. If you take bronze, and I love acronyms, so if we look at what the AAOMS has said, what their papers say, does the R in bronze just mean related or does it mean causally related? Well, I don't know how else it could be related. Well, I guess why didn't they call it beconge rather than bronze? They could have, Your Honor. But I think Mr. Vecchione pointed out that in the AAOMS publications themselves, there's a whole section entitled causality. That's what I wanted to focus on. Because if bisphosphonate related just meant there's some relation, like if you get ONJ, don't use these drugs to remedy it, that would be related but not causally related. But you're saying the AAOMS statements make clear that they thought that bronze was causally related? Yes, Your Honor. There is just absolutely no other way to read the AAOMS publications. In fact, one of the lines in the AAOMS publication says, studies have established a firm foundation for a strong association between bisphosphonate use and BRONJ. And that's in the section entitled causality. And clearly when one of the diagnostic criteria of the three is ruling out a different cause, radiation therapy to the jaws, clearly they're talking about causally related. That's why that diagnostic criterion exists, to rule out the most common other cause. Thank you. Because I took you over your time. Now we'll hear from Mr. Leon. Thank you, Your Honor. Thank you, Your Honor. In the Messick case, the court looked at Dr. Jackson, and like the court in Luttrell, and these are only two courts who have looked at Dr. Jackson's opinions, and they have both found that he failed to state a sufficient causation opinion and that he failed to state a reliable causation opinion. In the Messick case, the analysis was under Dawbert, and as I mentioned, as the court is aware, there's a highly deferential standard of review of abuse of discretion. And as this court said in the Claussen case, we may only reverse the district court if we are left with a definite and firm conviction that the district court committed a clear error of judgment in admitting the testimony. Okay, counsel, let me let you know what's on my mind, and then you can address it. You know, why isn't the use of a differential diagnosis, which doctors do all the time, why isn't that an appropriate scientific methodology? Indeed, a differential diagnosis may be an appropriate scientific methodology if it is reliably done. If the expert considers the evidence, rules in potential causes, rules out potential causes, and explains his reasons for doing so. I think what you've heard here, although plaintiffs suggest that Dr. Jackson did a differential diagnosis, is he didn't really because he thinks, according to plaintiffs, that the only thing that causes bronze is bisphosphonates. So why would you even do a differential diagnosis? According to plaintiff's counsel, if you have osteonecrosis of the jaw that lasts more than eight weeks, and you've taken bisphosphonates, bisphosphonates are the cause, end of story. Well, of course, that's not the case. That's not the case at all. Number one, that's not what Dr. Jackson actually says. In both of these cases, he has asked, did the bisphosphonates cause the plaintiff's ONJ? And he says, well, I wouldn't say cause, I would say related. I wouldn't say cause. It's like oxygen and fire. He never comes out and says, yes, there is causation. And so for that ground alone, his opinion in Luttrell was found to be an adequate specific causation opinion, and in Messick found to be not relevant. Then the second issue, again, is this bronze question. What does bronze mean? Well, the AAMS, which is a guidance document prepared by a group of oral surgeons, and it's on page 198 of the Messick record, and it says, epidemiological studies have established a compelling, albeit circumstantial, association between IV bisphosphonates and bronze in the setting of malignant disease. However, the current level of evidence does not fully support a cause and effect relationship between bisphosphonate exposure and osteonecrosis of the jaw. So at the first step, the one of general causation, AAMS isn't even unequivocal about that. But more importantly, it never says that someone who fits these diagnostic criteria had bisphosphonates as the cause of their injury. So why is opposing counsel wrong when he says that Dr. Jackson was, that it was permissible for Dr. Jackson to rule out other causes by relying on his experience and saying we just don't see it, we don't see this exposed jawbone persisting for eight or more weeks unless this person's taken bisphosphonate. What's wrong with that? That is insufficient to state an opinion under Daubert. As this court said in Daubert v. Merrill Dow II in 1995, that plaintiffs have presented us with, I believe the term was, opinions, conclusions, and without sufficient scientific reliability to those opinions. That's not enough. Look, plaintiffs are arguing that this guy's an expert and that's all he needs to be is just an expert. Obviously, that's not enough for Daubert. Well, I don't think that's fair. And I don't mean to interrupt you, but your time is clicking away. And you just responded to Judge Gould by agreeing that physicians perform differential diagnoses all the time. Why isn't it permissible to say I've treated lots and lots of ONJ patients and the only ones that I've seen where it persists for more than eight weeks are the ones who have taken this kind of drug? A differential diagnosis in the medical context is to determine a disease. What we're talking about here, as the Sixth Circuit in the Tamra's case said, is differential ideology using the same sort of similar analysis to determine a cause. And Dr. Jackson never says that he specifically did that. In fact, he never says that there is a cause. He just says it's related, and that's what the AALMS says. Now, in Daubert II, the court said we've been presented with expert qualifications, their conclusions, and their assurances of reliability. Under Daubert, that's not enough. And that's exactly what we're doing here. To reach his opinion in this case, Dr. Jackson spent 90 minutes reviewing the medical records and 10 minutes writing his report. That's at the record at ER 322 through 23. He did not look at any radiology. He did not look at any samples. He did not examine the plaintiff. He simply reached the conclusion, and he did look at the medical records, which use the term BRONJ, but the court looked at that as well and found that the treating physicians in those cases were using the term to describe a condition, not as causation. As a working diagnosis. And they specifically, Dr. Silverman, specifically said he did not do a differential diagnosis to reach his conclusions. And so the court said those treater opinions aren't enough, and while Dr. Jackson certainly can rely on those working diagnoses, he can't say, well, they all thought it was bisphosphonate cause, therefore I thought it was bisphosphonate cause, because the doctors didn't even think that. And so what he's left with is a lack of any sort of objective criteria. He simply says, I know it when I see it and I didn't see it here. That's not enough to meet the Daubert standards. A very instructive case, I mentioned the Simmons case, but another case in this context is the Perkins case. This was a district court case in Louisiana, and the plaintiff's expert was Dr. Marks, who plaintiff's counsel has referred to. He is their general causation expert. He has testified in a dozen cases. The court in Louisiana found that he was eminently qualified to talk about these issues. However, the basis for his specific causation opinion in Ms. Perkins' case was that, based on my experience, this is bisphosphonate related. And the court found that was simply ipsy-dixit. That was not a scientifically reliable opinion. It's what the Luttrell Court referred to as a bald assurance. It's what the Supreme Court in Joyner referred to as ipsy-dixit. And on motion for reconsideration, the court said that Dr. Marks' opinion is basically saying, I'm a doctor, trust me. I'm a doctor, trust me doesn't meet the Daubert standards. He has to provide objective criteria of reliability. And the only objective criteria that plaintiff's counsel point to is this AAMS definition of bronze. And that itself does not, number one, establish general causation. But more importantly, it certainly doesn't establish specific causation. Because the AAMS says that there are a number of other delayed healing conditions. This is, again, on page 198 of the record. And they talk about those. Why is it that those issues don't go to weight of testimony, as opposed to going to whether under Daubert you keep the doctor's opinion outside the courtroom? Yes, Your Honor. This court recently, in the Babrin v. Aston Johnson case, reaffirmed the district court's obligation to consider the reliability of the opinions and whether they meet a threshold. At a certain point, the issues of the basis for the opinions may be subject to appropriate cross-examination. But they have to make that initial showing. As the Supreme Court said in Daubert, expert testimony can be powerful and misleading. And it's up to the district court to evaluate that testimony and determine if it is sufficiently reliable to get to a jury. And here, where you have an expert whose opinions are based, well, number one, again, who doesn't even clearly state a causation opinion, and to the extent he has opinions, they are not based on objective, scientifically valid information. As the only two district courts to evaluate Dr. Jackson have concluded that that's not enough, and that's not enough to go to a jury. I have more time. You don't have to use it. Okay. That's up to you. All right. You don't have to keep arguing. Thank you, Your Honor. She had two related cases. Okay, Mr. I wasn't sure whether I had additional time or not. Well, I think you, Mr. Buchanan, you used your time up, but we'll give you one minute for rebuttal. Very briefly. First, I think counsel misspoke. Dr. Jackson did examine Ms. Messick. He examined her personally, and he also reviewed the medical records of the dentists and treating physicians. He reviewed their entire deposition testimony. So he had ample foundation for his expert opinion. I think counsel is wrong that clinical experience cannot be a basis for a physician's opinions. This court in Primiano v. Cook said in a causation case, physicians must use their knowledge and experience as a basis for weighing known factors, along with the inevitable uncertainties, to make a sound judgment. And that language, inevitable uncertainties, is really critical because another thing Primiano says is human ideology is never certain. The court said it also in Kennedy v. Collagen Corporation. A high level of certainty on causation is not required. These are jury questions, Judge Gould. I think everything counsel said goes to weight, not admissibility. The oxygen fire example, well, oxygen is a substantial factor in causing fire. And so Dr. Jackson's testimony that bisphosphonates is to bronze as oxygen is to fire, an essential ingredient, that itself supports a finding of causation. Counsel, I think your time is up. Thank you very much. We appreciate the argument. You sure may. You can have even more than a moment. You can have up to 549 moments, perhaps. Thank you, Your Honor. Yes, let me correct the record. In the Messick case, Dr. Jackson did interview Ms. Messick. However, it was long after her jaw had healed and it didn't play any role in his decision. In the Luttrell case, he did not interview Mr. Luttrell, but if he had that would have been after the jaw healed as well. This case is different from cases like Primiano because it does specifically refer to a situation in which there are a number of potential different causes and whether the expert reliably ruled out and identified the specific causes. Primiano was an unusual case involving a medical implant that failed in use, and it was an unusual circumstance. There wasn't any literature on it. There wasn't any independent evidence of it. It was essentially a res ipsa case. That's very different from all the cases that we've talked about in our brief, Meryl Dow v. Daubert, for starters, and the other cases, and the other Zometa cases which, like Perkins and like Simmons and their number of others, in which the courts found that the specific expert opinions were not sufficiently reliable to pass Daubert and should not go to a jury. Thank you, Your Honor. Now if you want to use up your other four minutes, you can. I'm going to let Mr. Buchanan have a final minute because I feel appellants should get the last word in these arguments. Very good, Your Honor. Thank you. Okay, thank you. Mr. Buchanan, you don't have to over- don't over-argue. I will not. Actually, the expert's testimony in Primiano was very similar to Dr. Jackson's. He said, based on his practice, he said, you don't see an artificial elbow wear through in just eight months. That's just something that you don't see. And that was the basis for his expert opinion. That's very similar to what Dr. Jackson testified to, clinical experience that supports the expert opinion. Okay, well, we don't see lawyers who do as fine a job as all of you have done today, so thank you very much. With that, unless the other judges have questions, the Messick case is submitted and you'll hear from us in due course.
judges: Fisher, Gould, Christen